## In re SEMMEL.

(District Court, M. D. Pennsylvania. November 29, 1902.)

### No. 93.

1. BANKRUPTCY—DISCHARGE—CONCEALMENT OF PROPERTY.

A bankrupt who, in the schedules accompanying his petition, declares he has no property, but later on, as part of his state exemption, claims certain property, is not on this account to be charged with concealing the property, so as to lose his right to a discharge.

2. SAME.

Nor is it a concealment that in so claiming a certain number of shares of stock he does not name the stock, and undervalues it, though this may be evidence on the question of concealment.

3. SAME—FALSE OATH.

A bankrupt who, in the schedules accompanying his petition, declares he has no property, but later on, as part of his state exemption, claims 5 shares of stock, not named, of the "nominal value of $120," when a few days later he received 10 shares of stock, under a contract he then had, and till then expected he was to receive 20 shares, or $1,000 worth, of the stock, will be held to have made a false representation with regard to his property, which, being sworn to by him in verifying his schedules, amounts to a false oath, which bars a discharge.

4. SAME.

The same is true with respect to a contract under which he was entitled to receive money; it not being mentioned, though it was nominally assigned to another, and was in fact assigned to the amount he owed the assignee; it otherwise being treated by him, the assignee, and the other party thereto, as his.

In Bankruptcy.

Frank Reeder, for bankrupt.

E. O. Nothstein and W. G. Freyman, for creditors.

ARCHBALD, District Judge. On December 14, 1901, Franklin P. Semmel filed a voluntary petition in this court, and was duly adjudged a bankrupt, and on January 23d following applied for his discharge. To this exception was taken on two grounds: (1) Because he had omitted from his schedules five shares of stock in the Montgomery Slate Company, of the par value of $50 each, which, it was claimed, he fraudulently concealed, and thus made a false oath in swearing to his petition; and (2) because he also failed to include therein a claim of $500 due him from the slate company. At the hearing before the referee a further exception was added: (3) That since filing his petition he had received $300 from the slate com-

¶ 3. See Bankruptcy, vol. 6, Cent. Dig. § 733.

pany, which was due at the time, and fraudulently omitted from his. schedules. The referee has sustained the exceptions and reported against a discharge, and the case is here on review of this decision. In addition to the testimony produced on the exceptions, it was agreed that that which had been taken on the proceedings to ascertain the assets should also be considered. By this agreement any objections which might otherwise have been made to its use were necessarily waived, and the ruling in Re Wilcox, 48 C. C. A. 567, 109 Fed. 628, does not, therefore, apply.

I. In the schedules which accompany his petition, the bankrupt declares that he has no stock in incorporated companies, nor in fact any property of any kind whatever, although later on, as part of his. $300 state exemption, he claims a horse, of the value of $150; a carriage, $30; harness, $10; office furniture, $15; and "five shares of stock," unnamed, of the "nominal value of $120." This property ought, to have been scheduled under the appropriate heads, but the bankrupt incurred no particular penalty because of the failure to do so; the actual possession of it being sufficiently indicated, although not in the proper place. Nor can he be charged with concealing the stock simply because he has undervalued it, the remedy for this. being by exception to his exemption claimed. But the fact that it was undervalued, as well as unnamed, is a circumstance of more or less weight on the question of concealment, if there is further evidence which bears it out. The exceptants contend that the bankrupt had 10 shares at the time he filed his petition, and, having professed to have but half the number, there was therefore a concealment and consequent false oath as to the other 5. According to the certificate of incorporation of the Montgomery Slate Company, which bears date October 1, 1901, Mr. Semmel subscribed for 20 shares of the capital stock, which was to be at the par value of $50 per share. He was one of the principal promoters of the company, and turned over to them an option on a slate quarry which he held in conjunction with a man named Seip, in consideration of which he was to receive $1,500 in cash, and a certain amount of paid-up stock. According to his testimony, he supposed he was to get 20 shares, but when the time came he was only allowed half that number; and the other 10, for which he had subscribed, he thereupon turned over to his wife, who borrowed the money, $500, and paid for them. I see nothing to warrant the conclusion of the referee that it was the bankrupt's money, and not that of his wife, that went into these shares. It is the direct and uncontradicted evidence that it was not, against which there is nothing but the mere circumstance that, about the time they were paid for, Mr. Semmel got $500 from the slate company on his option, which he swears he turned over to Hauk on the assignment of the option which he held, and this must be accepted. But as to the other 10 shares, I see no reasonable escape from the conclusion that there was a fraudulent concealment. The bankrupt,. as we have seen, discloses 5 shares, which he claimed as part of his. exemption, putting a value of $120 upon them. The explanation which he offers in his answer is that when he swore to his petition he in fact had but 5 shares, of the par value of $50, worth, as he be-

lieves, about $120; that since then, about December 19, 1901, the capital stock of the company, some $30,000, was readjusted without his knowledge, whereby he was given 10 shares of inflated stock, instead of the 5, which he had when his petition was sworn to, worth $13.50 a share, according to the value put upon them by the company, making $131.50 for the 10 he had; and that these 10 shares represented the same value and no more than the 5 shares which constituted his whole interest in the concern. His oral testimony, however, is considerably different. "When I made the schedule of my assets," he says, "I knew at the time that there was $7,500 paid in, and the company was capitalized at $30,000, and I could not arrive at the figure; that I was to have $500 worth of stock, and I valued it at one-fourth of $500, or $125, and I thought I would put it in my schedules at $125, * * * what I thought it was worth * * *; but I did not think of the $500 as ten shares of $50 each." It is possible that the variance in the number of shares might be accounted for in the way suggested, but that a fair and honest value was put upon them collectively is more than doubtful. Two days later, according to what he would have us believe, his wife, by his advice, borrowed money to take the other 10 shares, which he could not, paying $500 for what he had just sworn in his schedules were worth but $120. "I thought it was a good stock," he says in his testimony, "and she invested in it." This is entirely inconsistent with the valuation of 24 cents on the dollar at which he claimed the stock as part of his exemption. Nor is his explanation of how he figured out the value satisfactory, by distributing the money paid in, $7,500, over the whole authorized capital, $30,000. It was not until afterwards that the stock was watered by the distribution of the unpaid capital among the other stockholders; and it is to be noticed that, in the answer to which I have referred, he assigned this "readjustment" of the stock, as he calls it, as the ground for the value which he gives; thereby setting up something after the fact to account for that which had preceded it. Furthermore, from Mr. Heberling's testimony, we find that, when the time came for Mr. Semmel to get his stock, he made a strenuous claim for 20 shares, contending that that was the agreement, but was reminded that he had said when the company was organized that he and Seip, who held the option on the quarry with him, would each put in $500 in money, and take $500 in stock for their trouble, and that was what he was finally held to. It seems very difficult to believe, if such was the case, that he could have so completely forgotten it, and supposed, as he says, that he was to have but 5 shares, of the insignificant value of $120. Moreover, he swears himself that he expected to get $1,000 worth of stock, and did not learn that he was to have but one-half that amount until the stock was distributed, December 16th or 19th, a few days after his petition. Putting all the facts together, they disclose to my satisfaction that, whatever the number of shares he had, he purposely minimized the value so as to retain the stock by means of his state exemption under which he claimed it. A willful undervaluation, covered up in the way this is, I cannot but regard as a false representation by the bankrupt with regard to his property;

and, being sworn to by him in verifying his schedules, it amounts to a false oath, which bars a discharge.

2. Nor has he made a much better showing with regard to the money coming from the slate company on his agreement with them. As already stated, he was to get $1,500 in cash, and a certain amount of paid-up stock in the company. But after this arrangement was made, there was some hitch in the matter, and an attempt by the slate company to cut him out by dealing directly with the owners of the quarry on which he and Seip held the option. In this state of affairs, he went to his brother-in-law, Hauk, who had let him have money on the strength of the option, and assigned it to him; arranging with him to buy the property outright if necessary in order to hold the option and compel the slate company to carry out their agreement. The assignment to Hauk is dated July 30, 1901, and the consideration named in it is $250 received July 17, 1901; $350, July 22d; and a note of $500 given in April, 1898, with $60 interest added; making $1,160 in all. The intervention of Hauk was effective. He did not have to buy the property, nor in fact do anything with regard to it, except to stand by Semmel, which he did. The parties met together at Allentown; Hauk, Semmel, the officers of the slate company, and Bossan, one of the owners of the property, being present. At this interview, Hauk declared that he was ready to pay over the money for Bossan's interest, and Bossan was induced to say that he would not give a deed to any one except as Semmel directed. This brought the slate company to terms, and a new agreement was accordingly entered into, which was subsequently embodied in a writing bearing date October 1st following. By it Semmel assigned to the slate company the option which he held, and released the owners from any claim for making sale of their property, in consideration of which he was to have the same as before,—$1,500 in money and the amount of stock in the company which had been previously agreed upon. This agreement was subsequently, October 16th, transferred to Hauk by Semmel, by a writing indorsed on the back of it, and delivered over to him. Before that, however, Semmel was paid $750 by the slate company, $100 of which he gave to Bossan for standing by him at the Allentown meeting, and the other $650 he turned over to Hauk, by virtue of the arrangement between them. So the matter stood when Semmel went into bankruptcy. Since then, on December 16th, he received and receipted for $300 from the slate company, which he also turned over to Hauk; making $950 which the latter has received, and leaving $450 still due from the slate company on the contract. The question is whether this money belongs to Hauk or to Semmel, not only legally, but by the understanding and intention of the parties. Apparently, it belongs to the former, that being the legal effect of the assignment. But acts speak louder than words, and we have a right to look at the conduct of the parties, as well as the writings between them, to judge of their significance. Notwithstanding the fact that Semmel's option had been assigned to Hauk at the time of the Allentown meeting, Hauk attended that meeting, not to protect his own interest, but that of Semmel; thus recognizing that the latter had an

interest, regardless of the assignment. "I had the information," says Hauk, "to go down there and see that Mr. Semmel got his rights. If he did not, I was going to buy the property,—the Bossan portion." Semmel says: "I asked him to see me through, and offered him $500. Q. To do what? A. To raise the money to bring them to terms; * * * To buy from Bossan the one-half, so as to bring the slate company to terms." The result was a settlement, not between Hauk and the slate company, but between the slate company and Semmel, with whom, as we have seen, a new agreement was subsequently executed. This also was assigned to Hauk, but it was made in the name of Semmel, which is the significant part of it. The terms on which the assignment was given to Hauk are not stated, but we may assume that they were the same as in the one previous, the recited consideration of which is $1,160. This we must regard as the whole of it, for, although Semmel does say that he offered Hauk $500 "to see me through," yet, as this involved the raising of the money to buy out Bossan, which did not have to be done, it is to be taken as a mere offer, which went no further. But the most expressive thing of the whole transaction is that, notwithstanding the assignment, which, in terms, carried everything that was coming to Semmel under the agreement, including the shares of stock which were to be given him as part of the consideration, there is no claim that these shares ever belonged to Hauk, nor is there the first suggestion of it. How does it happen that they were not his, if the whole of Semmel's interest passed by the transfer? And what conclusion are we entitled to draw from this circumstance? The exercise of dominion over property is the highest indicia of ownership, and that, as it seems to me, is what may well guide us here. Through the whole transaction it is Semmel, and not Hauk, who acts and is recognized as the real owner by both. It was his rights that were to be protected when the parties met at Allentown, and it is with him that the settlement and subsequent writing are made. It is he who draws the money on the contract, although in the end, as he says, he turned it over to Hauk; and finally it is he who claims and receives in his own name, and for his own benefit, the shares of stock which the company allot to him, and it is with him that it is arranged how many these shall be. Assuming that Hauk advanced the money which it is said he did on the strength of the option,—$250 at one time, and $350 at another,—and also surrendered Semmel's note or duebill of $500, with $60 of interest, the only conclusion consistent with the evidence is that this was the measure of his interest in the option, and that the rest of it belonged to Semmel, and was held for his benefit. The shares of stock which it carried certainly were, and why not, also, the money, over and above what Hauk had in it? He has received $650 from the first payment, of $750,—$100 having gone to Bossan,—and $300, the next one. This leaves $240 due him out of the $450 still unpaid. The rest belongs to Semmel, and it does him no injustice to hold that he must have known it when he made up his schedules. If it was, he should have so stated; and, failing to do so, he made a willful misstatement and misrepresenta-

tion with regard to his assets, resulting in this respect, also, in a false verification of his schedules, which is a bar to his discharge.

3. The third objection is not sustained. It was filed before the referee at the hearing, and exception is taken to it on that ground. But without passing upon that question, I am satisfied that the assignment, as already indicated, was effective to the extent of the consideration named in it, which includes the $300 received by Semmel on Hauk's account since his bankruptcy. To that extent the report of the referee is not sustained. But as to the rest, it is, and, in conformity with what is there recommended, a discharge is refused.